IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 15, 2004

## STATE OF TENNESSEE v. JOSEPH VERMEAL

**Direct Appeal from the Circuit Court for Warren County**
**No. F-8351     Larry B. Stanley, Jr., Judge**

---

**No. M2004-00046-CCA-R3-CD - Filed April 29, 2005**

---

The appellant, Joseph Vermeal, was convicted by a jury in the Warren County Circuit Court of aggravated sexual battery and was sentenced to nine years incarceration in the Tennessee Department of Correction. On appeal, the appellant alleges that the evidence was insufficient to support his conviction, and he contends that the trial court erred in refusing to permit his expert witness to testify. Upon our review of the record and the parties' briefs, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court is Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the court, in which JERRY L. SMITH and JOHN EVERETT WILLIAMS, JJ., joined.

Rick L. Stacy (at trial and on appeal) and Lisa Zavogiannis (at trial), McMinnville, Tennessee, for the appellant, Joseph Vermeal.

Paul G. Summers, Attorney General and Reporter; Elizabeth B. Marney, Assistant Attorney General; Dale Potter, District Attorney General; and Thomas Miner, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION
### I.  Factual Background

The appellant was indicted by the Warren County Grand Jury for rape of a child. In the light most favorable to the State, the proof adduced at trial revealed that on August 26, 2000, Pioneer Community Baptist Church sponsored a block party in the parking lot of nearby Country Place Apartments. The party began at 10:00 a.m. and lasted until 2:00 p.m. During the party, John Thompson, the pastor of the church, saw the appellant on his porch at the apartment complex. Thompson introduced himself to the appellant, and the two men spoke briefly. Thompson observed that the appellant was drinking beer, but he did not appear intoxicated. Later, Thompson saw the appellant standing near a dunking machine that had been set up for the party. Thompson stated that

a number of children were taking turns going into the water. Thompson saw a child enter the appellant's apartment and exit with towels. The appellant distributed these towels to the wet children. Throughout the party, Thompson saw children going into and leaving the appellant's apartment.

After the party ended, the victim, JP,[1] and her friend, Nichole Orcutt, both of whom were eight years old, rode their bicycles with some friends. One of the other children told Orcutt that they could obtain ice cream at the appellant's apartment. The children went to the appellant's apartment and found that the appellant was home. The children got popsicles from the appellant's freezer, and ate them on the appellant's front porch. Afterward, the children went inside the appellant's apartment to watch television and jump on the appellant's waterbed. Soon, all of the children except Orcutt and JP went home.

At trial, Orcutt recalled that she was in the living room while JP was jumping on the appellant's bed. The appellant went into the bedroom. Orcutt looked into the bedroom and saw that the appellant "had taken some of [JP's] clothes off and his pants and had his, um, private part to her private part." JP testified that the appellant knocked her onto the bed, removed her pants and underwear, removed his own pants and underwear, and penetrated her vagina with his penis. After the incident, the children left the appellant's apartment.

Charles Ikeard, who testified for the appellant, remembered going to the appellant's apartment after the block party. He saw that Orcutt and JP were playing on the appellant's bed. Ikeard told the appellant that "it didn't look good" that the girls were in the apartment with the appellant. Then, Ikeard told the children to go home. Ikeard also informed the children's parents of the girls' location.

Howard Orcutt, Nichole Orcutt's father, stated that on the night of the offense he was told that his daughter was in the appellant's apartment. After receiving the information, Mr. Orcutt approached the appellant, who was on his porch. Mr. Orcutt confronted the appellant, asking why his daughter had been in the appellant's apartment. The appellant pushed Mr. Orcutt. Then, Mr. Orcutt "put him in the hospital," beating the appellant so severely that an ambulance was called.

Nichole Orcutt and JP were taken to the District Attorney General's Office for questioning. Initially, the children denied that anything had happened. However, almost immediately thereafter, JP stated that the appellant abused her after plying her with liquor and threatening her with a knife. At trial, JP explained that she manufactured these additional details due to her fear that she would get in trouble with her mother because she was not supposed to be in the appellant's apartment, and she just wanted the ordeal to be over. Orcutt also explained that her previous statements may have contained inconsistencies because she was "freaked out" by the incident and "now I can remember everything that happened because I ain't that scared."

---

[1] It is the policy of this court to refer to minor victims of sexual crimes by their initials.

At the conclusion of the proof, the jury acquitted the appellant of the charged offense but found him guilty of the lesser-included offense of aggravated sexual battery. The trial court imposed a sentence of nine years. On appeal, the appellant questions whether the evidence was sufficient to sustain his conviction and "[w]hether the trial court committed reversible error in not admitting the testimony of the defense's expert witness into evidence."

## II. Analysis

In his first issue, the appellant challenges the sufficiency of the evidence supporting his conviction, specifically complaining that "[t]here was no physical, biological or medical evidence presented that [he] committed an aggravated sexual battery." In his second issue, the appellant contends that "the trial court erred in overruling the [appellant's] motion for judgment of acquittal based upon [JP's] testimony that she had lied under oath during her preliminary hearing testimony." The appellant also notes that the trial court "abused its discretion in not disregarding the testimony of the young girls in its capacity as thirteenth juror."

This court has observed that once the trial court has approved the verdict as the thirteenth juror, as it has in this case, our appellate review is then limited to determining the sufficiency of the evidence. See State v. Burlison, 868 S.W.2d 713, 719 (Tenn. Crim. App. 1993). Moreover, "[t]he standard by which the trial court determines a motion for judgment of acquittal at the end of all the proof is, in essence, the same standard which applies on appeal in determining the sufficiency of the evidence after a conviction." State v. Thompson, 88 S.W.3d 611, 614-15 (Tenn. Crim. App. 2000). Therefore, we will address the appellant's complaints as a challenge to the sufficiency of the evidence.

On appeal, a jury conviction removes the presumption of the appellant's innocence and replaces it with one of guilt, so that the appellant carries the burden of demonstrating to this court why the evidence will not support the jury's findings. See State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellant must establish that no "reasonable trier of fact" could have found the essential elements of the offense beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); Tenn. R. App. P. 13(e).

Accordingly, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences which may be drawn therefrom. See State v. Williams, 657 S.W.2d 405, 410 (Tenn. 1983). In other words, questions concerning the credibility of witnesses and the weight and value to be given the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact, and not the appellate courts. See State v. Pruett, 788 S.W.2d 559, 561 (Tenn. 1990).

In the instant case, the appellant was convicted of aggravated sexual battery. "Aggravated sexual battery is unlawful sexual contact with a victim by the defendant or the defendant by a victim" when the "victim is less than thirteen (13) years of age." Tenn. Code Ann. § 39-13-504(a)(4) (2003). "'Sexual contact' includes the intentional touching of the victim's [or] the defendant's . . . intimate

parts, . . . if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." Tenn. Code Ann. § 39-13-501(6) (2003). Additionally, it is permissible for a jury to "use their common knowledge and experience in making reasonable inferences from evidence." State v. Meeks, 876 S.W.2d 121, 131 (Tenn. Crim. App. 1993). Specifically, a jury may draw upon their common knowledge to infer that an accused forced intimate contact for the purpose of sexual arousal or gratification. See State v. Jack Warren Emert, Jr., No. 03C01-9802-CC-00074, 1999 WL 512029, at *2 (Tenn. Crim. App. at Knoxville, July 21, 1999).

In the instant case, the proof is uncontroverted that JP was under thirteen years of age at the time of the offense. Both JP and Orcutt testified that the appellant removed the bottom half of his and JP's clothes and positioned himself on top of JP, with their genitals touching. The jury, as was their prerogative, chose to believe JP and Orcutt. We conclude that the testimony of JP and Orcutt is sufficient to sustain the appellant's conviction.

However, before we end our analysis, we will address the appellant's challenges to the testimony of both JP and Orcutt. First, the appellant claims that Orcutt's "testimony should have been declared incredible as a matter of law by the court and disregarded by the jury pursuant to the so-called 'physical facts rule.'" The "physical facts rule" allows testimony to be disregarded "where the testimony of a witness is entirely irreconcilable with the physical evidence." State v. Hornsby, 858 S.W.2d 892, 894 (Tenn. 1993). Prior to declaring testimony incredible as a matter of law, "it must be unbelievable on its face, i.e., testimony as to facts or events that the witness physically could not have possibly observed or events that could not have occurred under the laws of nature." Id. Our supreme court has cautioned that "the power to disregard oral testimony because of its inherent lack of believability is one that should be used sparingly." Id. at 895.

The appellant alleges that Orcutt's testimony should be considered incredible because "there was overwhelming evidence that [she] did not in fact witness the alleged incident." As proof of his allegation, the appellant states that Orcutt testified at trial that she witnessed the incident from the living room, contrary to her previous statement to Investigator Derwin Adcock that she witnessed the incident from the appellant's front porch. Additionally, the appellant notes that JP stated that Orcutt was not in the room during the incident. Further, the appellant cites discrepancies between the testimony of JP and Orcutt. The appellant's complaints do not indicate that it was physically impossible for Orcutt to have witnessed the offense. Instead, the appellant's complaints center around Orcutt's believability, a question which was properly determined by the jury in this case. This issue has no merit.

Next, the appellant contends that JP's testimony is subject to the rule of cancellation. Specifically, the appellant maintains that JP "testified under oath to two very different accounts of what allegedly occurred. . . . Here there was no reasonable explanation for [JP's] admitted perjury." In Tennessee, "contradictory statements by a witness in connection with the same fact cancel each other." State v. Matthews, 888 S.W.2d 446, 449 (Tenn. Crim. App. 1993). Moreover, "[t]he rule of cancellation is typically limited to circumstances in which the witness has sworn to each statement." State v. Cayle Wayne Harris, No. M2000-02143-CCA-R3-CD, 2001 WL 1218582, at

-4-

*2 (Tenn. Crim. App. at Nashville, Oct. 12, 2001). Nevertheless, "[t]his rule of cancellation applies only when inconsistency in a witness' testimony is unexplained and when neither version of [her] testimony is corroborated by other evidence." Matthews, 888 S.W.2d at 449 (citing Taylor v. Nashville Banner Pub. Co., 573 S.W.2d 476, 483 (Tenn. App. 1978)).

In the instant case, JP apparently gave two versions of the offense prior to testifying at trial. First, JP told an employee of the Department of Children's Services (DCS) that nothing happened, then quickly amended her story to allege that the appellant gave her liquor to drink and threatened her with a knife prior to abusing her. We are unable to determine if this was a sworn statement. Nevertheless, JP explained at trial that she initially said that the appellant threatened her and gave her liquor "[b]ecause I didn't really want nothing to happen to me again and I was scared." After her statement to the DCS worker but prior to her testimony at the instant trial, JP testified in another proceeding.[2] At that proceeding, JP testified that the appellant "hadn't done anything" to her. At the instant trial, JP explained that she denied the offense at the prior proceeding "[b]ecause I wanted him to stay in jail." Additionally, JP explained that she was embarrassed by the offense and was frightened of the appellant. Further, JP asserted that she "told people in the past that nothing happened just in the hopes of getting this over so [she] wouldn't have to talk about it anymore." Thus, JP clearly explained her reasons for giving various versions of the offense. See State v. Caldwell, 977 S.W.2d 110, 118 (Tenn. Crim. App. 1997). Moreover, JP's testimony was corroborated by Orcutt. Therefore, the rule of cancellation does not apply. Accordingly, the testimony of Orcutt and JP were properly considered by the jury and the trial court in determining the appellant's guilt.

## B. Expert Witness

As his final issue, the appellant argues that the "trial court committed reversible error in not admitting a qualified expert's testimony concerning professionally acceptable interviewing techniques of children." Generally, the trial court has broad discretion in determining the qualifications, admissibility, relevancy, and competency of expert testimony. See State v. Stevens, 78 S.W.3d 817, 832 (Tenn. 2002). As such, this court will not overturn the trial court's ruling on the admissibility of expert testimony absent an abuse of that discretion. See State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993).

Prior to trial, the State filed a motion in limine to exclude the testimony of Dr. William Bernet, a prospective expert witness for the defense. The State contended that the appellant had indicated his intention "to call Dr. Bernet to give testimony regarding the proper method for interviewing children and investigating allegations of child maltreatment, the various explanations for false allegations by children, and the factors that are consistent with true and false allegations by children." The State argued that such testimony did not meet the test set forth in McDaniel v. CSX Transportation, Inc., 955 S.W.2d 257 (Tenn. 1997), nor did it satisfy the requirements of Tennessee Rule of Evidence 702.

---

[2] The record does not reflect the nature of the prior proceeding.

The trial court entered an order, granting the State's motion in limine. In its order, the trial court found that Dr. Bernet's proposed testimony did not meet the standards of reliability announced in McDaniel and would not substantially assist the trier of fact to understand the evidence or determine a fact in issue as required by Rule 702. Additionally, the court relied upon State v. Coley, 32 S.W.3d 831 (Tenn. 2000), which case provided for the exclusion of expert testimony generalizing the unreliability of eyewitness testimony.

Immediately prior to trial, the appellant called Dr. Bernet to the stand to make an offer of proof regarding his proposed testimony. Dr. Bernet testified that he was a graduate of Harvard Medical School and was board certified "in general psychiatry and in child and adolescent psychiatry and in forensic psychiatry." Dr. Bernet asserted that his testimony would relate to three issues. First, he would explain to the jury "the proper methods for interviewing children in investigating allegations of maltreatment." Second, he would discuss "the various mechanisms, psychological mechanisms, by which false statements are made by children." Finally, he would testify regarding "what has been studied in research with children in these situations and to be able to explain or to list different factors that are consistent with true allegations and different factors that are consistent with false allegations of abuse."

As an example, Dr. Bernet explained that he would inform the jury that asking a potential child sexual abuse victim suggestive, leading, or repetitive questions was ill-advised. Dr. Bernet, had "reviewed the interview" of the DCS worker and JP and concluded that JP had been asked questions which influenced the answers she gave. Dr. Bernet also noted that there were indications in JP's previous statements which suggested that the allegations were true, and there were other indications which would suggest the allegations were false. Dr. Bernet stated that his testimony would serve to aid the jury in determining the credibility of the statements of the child witnesses and "help them be aware of issues they need to be aware of."

At the conclusion of the offer of proof, the trial court reiterated its grant of the State's motion in limine. The court observed that Dr. Bernet was "eminently qualified in the areas which he stated," but he did not give jurors "enough credit about knowing . . . a lot of these things were common sense." Specifically, the court stated that "everyone can understand a leading question leads to an answer whether it was true or not." The trial court noted that the doctor's testimony would not substantially assist the trier of fact.

Tennessee Rule of Evidence 702 provides:

> If scientific, technical, or other specialized knowledge will substantially assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise.

Further, McDaniel suggested the following criteria a court may consider in determining the reliability

of proposed expert testimony:

> (1) whether scientific evidence has been tested and the methodology with which it has been tested; (2) whether the evidence has been subjected to peer review or publication; (3) whether a potential rate of error is known; (4) whether . . . the evidence is generally accepted in the scientific community; and (5) whether the expert's research in the field has been conducted independent of litigation.

955 S.W.2d at 265.

In Coley, our supreme court examined the strictures of Rule 702 and McDaniel in determining the admissibility of expert testimony concerning the reliability of eyewitness testimony. The court noted that the testimony proposed in Coley was "of a general nature designed to affect the juror's decision on the credibility of witnesses." Coley, 32 S.W.3d at 835. The court emphasized that "the assessment of witness credibility and the role of fact-finder is always left to the jury, regardless of the issue present in the case." Id. Finally, the court found that

> expert testimony concerning eyewitness identification simply offers generalities and is not specific to the witness whose testimony is in question. Moreover, we are of the opinion that the subject of the reliability of eyewitness identification is within the common understanding of reasonable persons.

Id. at 837. Thus, the court concluded that the trial court had properly excluded Coley's expert witness. Id. at 838.

Recently, in State v. Howard Walter Thomas, No. E2003-02090-CCA-R3-CD, 2005 WL 735040, (Tenn. Crim. App. at Knoxville, Mar. 30, 2005), this court addressed a similar issue. In Thomas, the defendant argued that the victim's identification was plagued with problems, such as a time gap between the crimes and her identification of the defendant as the perpetrator, the use of hypnosis, and the victim's exposure to news about the case and a photograph of the defendant prior to her identification. Id. at *21. Based upon these alleged problems with the victim's testimony, Thomas sought to introduce an expert witness who would "testify about the 'workings of human memory,' the effects of factors such as suggestions on memory, and the creation and characteristics of false memory." Id. On appeal, the appellant challenged the trial court's refusal to admit the testimony of the expert witness. This court noted:

> In Coley, our supreme court relied upon [State v. Ballard, 855 S.W.2d 557, 562 (Tenn. 1993)], which explained that "expert testimony describing the behavior of an allegedly sexually abused child is not reliable enough to 'substantially assist' a jury in an inquiry of whether the crime of child sexual abuse has taken place," and State v.

-7-

Schimpf, 782 S.W.2d 186, 193-94 (Tenn. Crim. App. 1989), which explained that expert testimony, concerning child sexual abuse syndrome, that a child had been sexually abused "invaded the jury's province by offering testimony which ultimately went to credibility."

Id. at *24. This court found that the testimony of Thomas' proposed expert likewise would "invad[e] the province of the jury in assessing the credibility of the eyewitness identifications." Id. Thus, this court upheld the trial court's refusal to admit the expert testimony. Id.

Our review of the record in the instant case convinces us that the testimony of Dr. Bernet regarding the interviewing techniques of alleged child sexual abuse victims is akin to that proposed in Coley and in Thomas. Dr. Bernet's testimony was geared toward assessing the credibility of the child witnesses. The assessment of witness credibility rests in the province of the jury. Therefore, we conclude that, like in Coley and in Thomas, the trial court in the instant case properly excluded the testimony of the appellant's prospective expert witness, which testimony would have invaded the province of the jury.

### III.  Conclusion

Finding no error, we affirm the judgment of the trial court.

_____
NORMA McGEE OGLE, JUDGE

-8-